Cite as 2024 Ark. App. 430

# ARKANSAS COURT OF APPEALS

DIVISION II
No. CV-24-149

| | |
|---|---|
| | Opinion Delivered September 18, 2024 |
| BOBBIE REYNOLDS | |
| APPELLANT | APPEAL FROM THE CLAY COUNTY COUNTY CIRCUIT COURT, WESTERN DISTRICT |
| V. | [NO. 11CJV-22-6] |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD | HONORABLE CHARLES M. MOONEY, JR., JUDGE |
| APPELLEES | AFFIRMED |

## STEPHANIE POTTER BARRETT, Judge

Bobbie Reynolds appeals the Clay County Circuit Court's order terminating her parental rights to her son, MC (DOB 12/28/13). On appeal, Reynolds argues that the circuit court erred in terminating her parental rights because she "had worked diligently towards the goal of reunification with her son and could provide a safe and stable home for the child." We affirm the termination.

The Arkansas Department of Human Services (DHS) filed a petition for emergency custody of MC on June 9, 2022; at that time, both Reynolds and Timothy Collins, who was named in the petition as MC's putative father,[1] were incarcerated in the Greene County

---

[1] Collins was later determined to be MC's biological and legal father through DNA evidence; an order to this effect was entered on November 4, 2022. Although DHS also filed a petition to terminate Collins's parental rights, he is not a party to this appeal.

Detention Center. The bases for removal were the parents' current incarceration and their unwillingness or inability to meet MC's needs for food, clothing, shelter, and medical and mental-health care. Collins had also reported that Reynolds had been diagnosed with paranoid schizophrenia, bipolar disorder, and a sleep disorder, and she had not been taking her medications. The circuit court granted DHS an ex parte order of emergency custody on June 16.

A probable-cause order was entered on June 30, with the parties stipulating that there was probable cause for MC to remain in DHS custody. In that order, the parties were directed, among other things, to remain drug-free; submit to random drug screens; participate in parenting classes; obtain clean, safe, and stable housing with utilities; obtain and maintain stable employment; and submit to a drug-and-alcohol assessment and follow the recommendations.

An adjudication order was entered on July 1. The order reflected that the parties stipulated that MC was dependent-neglected, that return of his custody to them was contrary to his welfare, and that it was in MC's best interest for him to remain in DHS custody.

The circuit court entered a review order on November 18, finding that Reynolds and Collins were not fit, finding that MC's health and safety could not be protected if he was returned to them, and continuing MC's custody with DHS. The order noted the circuit court's concerns that prevented trial placement or return of custody to Reynolds and Collins, which included their lack of safe and stable housing, failure to maintain gainful employment, and failure to follow court orders regarding their drug and mental-health issues. The circuit

2

court continued reunification as the goal of the case with a concurrent goal of relative or fictive-kin placement. The circuit court found that Reynolds had partially complied with the case plan by completing one day of parenting classes, but she did not have stable employment; she and Collins were living in a camper that had no running water; she did not have a driver's license; she had failed to appear for two drug-and-alcohol assessments; she was not attending counseling; she did not make herself available for random home visits and drug screens; the drug screen she did submit to was positive for K2; and she had recently been placed on felony probation in Missouri, which prevented her from living outside of Missouri. Drug-and-alcohol assessments and mental-health evaluations were again ordered for both Reynolds and Collins.

A permanency-planning order was filed on May 19, 2023, changing the goal of the case from reunification to termination of parental rights and adoption with a concurrent goal of guardianship with relatives. The order noted that Reynolds had made no progress since the review hearing; she had not completed her mental-health assessment because she was not home when DHS attempted to transport her to the appointment; there had been inappropriate parental behavior at the last visitation on February 23; and there had been no visitation since that time because Reynolds never confirmed that she was available for visitation.

DHS filed a petition for termination of parental rights on June 9, alleging that termination was in MC's best interest and asserting the following grounds for termination: (1) MC had been adjudicated dependent-neglected and had continued out of Reynolds's

home for twelve months, and despite a meaningful effort by DHS to rehabilitate Reynolds and correct the conditions that prevented MC from safely being placed in the Reynolds's home, Reynolds had not remedied the conditions; (2) other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrated placement of MC in Reynolds's custody was contrary to his health, safety, or welfare and that despite the offer of appropriate family services, Reynolds had manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the circumstances that prevented placement of MC with her; and (3) Reynolds had subjected MC to aggravated circumstances.

A hearing on the petition to terminate Reynolds's parental rights was held on November 17, 2023. Elizabeth DiPaola, the DHS caseworker assigned to MC's case, testified that MC was doing well in his placement with Collins's cousin and that it was a potential permanent home if the circuit court terminated parental rights. DiPaola testified that DHS had continued concerns about Reynolds's lack of appropriate housing as well as her drug use and mental-health issues, which still existed at the time of the termination hearing. DHS had been unable to perform home visits because, although Reynolds had informed her that she was living in Missouri, she had failed to provide any further information regarding her housing situation. DiPaola testified that Reynolds's communication with DHS had been sporadic; that Reynolds had never completed a mental-health assessment, which led to her discharge by the mental-health provider due to noncompliance; and that Reynolds had never submitted to a hair-follicle drug test, despite being ordered twice by the circuit court to do

so. Reynolds was convicted of a felony in Missouri after the DHS case had begun, and she had not visited MC since February 2023. DiPaola testified that Reynolds was in no better position at the termination hearing than she was when MC was removed from her custody, that MC is adoptable, and that he would be subjected to potential harm if returned to Reynolds's custody due to lack of a stable home.

Reynolds testified that she and Collins lived in a house in Poplar Bluff, Missouri, that she was leasing with the option to purchase. She said that MC's room had a bed with a mattress and box springs but that there was no hot water, and she was still remodeling the house. She agreed that she had not exercised visitation, noting that DHS would not transport her from Missouri. With regard to the hair-follicle test, Reynolds claimed that she had issues with transportation to Arkansas to have the test performed. While Reynolds acknowledged that she had not attended mental-health counseling, she claimed that she does not need it because she does not have a problem; however, she was willing to attend counseling if that meant she could see MC. Reynolds admitted that she had been placed on felony probation in Missouri and that she has four years left to serve.

At the close of the testimony, the circuit court told Reynolds that she was in no better position at the time of the termination hearing than when the case began—she had failed to address her mental-health issues, and she continued to have legal issues in both Arkansas and Missouri. The circuit court did not find Reynolds's testimony credible, and it noted that Reynolds had refused to comply with every order in the case. On January 12, 2024, the circuit court entered an order terminating Reynolds's parental rights on all three bases

alleged by DHS and finding that termination was in MC's best interest because he is adoptable and would be subjected to potential harm if returned to Reynolds's custody.

Termination of parental rights is a two-step process requiring a circuit court to find at least one statutory ground for termination and that termination is in the juvenile's best interest. *Bobbitt v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 355. Both the statutory grounds and the best-interest finding must be proved by clear and convincing evidence. *Rugama v. Ark. Dep't of Hum. Servs.*, 2024 Ark. App. 62, 684 S.W.3d 256. Clear and convincing evidence is the degree of proof that will produce in the fact-finder a firm conviction of the allegation sought to be established. *Id.*

We review termination-of-parental-rights cases de novo but will not reverse the circuit court's ruling unless its findings are clearly erroneous. *Jennings v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 429, 636 S.W.3d 119. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In determining whether a finding is clearly erroneous, an appellate court gives due deference to the circuit court's opportunity to judge the credibility of the witnesses. *Id.*

Proof of only one statutory ground is sufficient to terminate parental rights. *Barris v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 380. On appeal, Reynolds addresses the twelve-month failure-to-remedy ground, arguing that while MC was out of her custody for more than twelve months, "she was in compliance with the Court's orders and was able to provide a home at any time." However, she fails to address the two other statutory grounds on which

6

the circuit court terminated her parental rights—subsequent factors and aggravated circumstances. When an appellant fails to challenge the circuit court's independent, alternative grounds for its ruling, this court will not reverse the termination decision. *Carson v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 399. Nevertheless, Reynolds's argument that the twelve-month failure-to-remedy ground was not proved is incorrect. At the close of the termination hearing, the circuit court specifically found that Reynolds had refused to comply with every order in her case, had failed to address her mental-health and legal issues, and was in no better position at the termination hearing than when the case began. A circuit court does not commit reversible error by weighing the evidence differently than how the appellant asks the evidence to be weighed. *Schultz v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 175, 643 S.W.3d 856. As for termination being in MC's best interest, Reynolds made no argument on appeal that the circuit court's best-interest determination was clearly erroneous. We affirm the circuit court's decision terminating Reynolds's parental rights.

Affirmed.

WOOD and HIXSON, JJ., agree.

*Terry Goodwin Jones*, for appellant.

*Kaylee Wedgeworth*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor child.

7